UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

VICTORIA KENNEDY,

        Plaintiff,

  v.                                    Case No. 05-C-847

JO ANNE BARNHART,
Commissioner of Social Security,

        Defendant.

**DECISION AND ORDER**

Plaintiff Victoria Kennedy seeks review of the Commissioner's decision denying her application for disability benefits. She claims that the ALJ's decision denying her benefits was not supported by substantial evidence and that the ALJ failed to give proper deference to the opinion of her treating physician. She also claims the ALJ's question to the vocational expert was not supported by the record. The government has responded in support of the ALJ's decision, and no reply brief was filed by the plaintiff. For the reasons given below, the case will be remanded for further proceedings.

**I. Background**

Victoria Kennedy is a 52 year-old high school graduate who has not worked for several years. During the 1990's she was employed occasionally as a bartender, cashier and bookkeeper. She had also worked as a home health aid. Over the years, Kennedy had experienced fibromyalgia, depression and feelings of hopelessness. In psychiatric interviews, she often appeared withdrawn

and sometimes exhibited substantial difficulty communicating. She was diagnosed with bipolar affective disorder.

On April 4, 2000 Kennedy was evaluated, at the Social Security Administration's request, by Dr. Dennis Elmergreen. He noted that her hygiene was good and that she was cooperative and talkative. (Tr. 130.) She interacted in a meaningful fashion and expressed herself appropriately and "appeared to have good social skills." (Tr. 130.) She did, however, appear depressed.[1]

In June 2000, Kennedy was admitted to St. Michael's Hospital in Stevens Point upon presenting with suicidal feelings and depression. From that point on, Kennedy was seen somewhat frequently by a Stevens Point psychiatrist named Anna Cothron, M.D. In the initial interview, Dr. Cothron noted that Kennedy was depressed, withdrawn and experiencing hopelessness. (Tr. 146.) Two weeks later, Dr. Cothron again saw the plaintiff and reported that her symptoms were less severe, although she continued to have a great deal of anxiety. (Tr. 215.) The next month, Kennedy was referred to Dr. Cothron by her social worker due to promiscuous behavior, excessive drinking and other reckless activity. (Tr. 213.) Dr. Cothron noted almost no eye contact from Kennedy and increased irritability, as well as a withdrawn and quiet demeanor. In August, Dr. Cothron filled out a psychiatric questionnaire for the state Department of Health and Family Services. (Tr. 217.) On the form, Dr. Cothron noted Kennedy's social phobia, depression, bipolar affective disorder and anxiety. She also noted her decreased hygiene and sleep difficulties.

In September 2000, Kennedy met again with Dr. Cothron, reporting mood swings and a feeling of low motivation and dragging. (Tr. 269.) Dr. Cothron noted her low level of eye contact

---

[1] In addition, throughout the relevant time period Kennedy saw other health professionals. Their conclusions are not at the center of her appeal, however.

2

and her monotonous speech. They met again in December, and Kennedy appeared frustrated and angry with the government's welfare and social security system. (Tr. 265.) Again, she made little eye contact and appeared irritable.

Dr. Cothron filled out a questionnaire in April 2001, apparently at the behest of Kennedy's attorney. (Tr. 223-230.) The questionnaire's contents are addressed in detail below, but in general it painted a portrait of a patient with marked and moderate difficulties in several areas of social functioning. Dr. Cothron continued seeing Kennedy sporadically throughout 2001, and Kennedy continued to present with similar symptoms. In a June 7, 2001 letter to Kennedy's attorney, Dr. Cothron stated that Kennedy's "progress was sporadic with disabling symptomology persistent." (Tr. 238.) Dr. Cothron echoed this conclusion in a letter dated October 10, 2001, stating that Kennedy "will continue to be limited in her ability to be employed in any consistent capacity on a long-term basis due to the level of disability her illnesses have caused." (Tr. 235.)

Kennedy's application for benefits was heard in November 2001. The testifying medical expert was Allen Hauer, Ph.D., a clinical psychologist. ALJ Arthur Schneider denied benefits in a decision dated December 27, 2001. Plaintiff requested review by the Appeals Council, although for reasons not in the record the Council took more than three years to deny her request for review. She then filed this action seeking review of the ALJ's decision.

**II. Analysis**

**1. Listing 12.04**

Plaintiff first argues that she met the criteria for being per se disabled under Listing 12.04, affective disorders. Relevant here, the ALJ found that Kennedy did meet some of the criteria (involving depression and bipolar disorder), but did not sufficiently meet other criteria relating to

3

daily activities, social functioning, and the like, to qualify under the listing. Specifically, to qualify under 12.04 the plaintiff needed to demonstrate at least two of the following criteria:

1. Marked restriction of activities of daily living;
2. Marked difficulties in maintaining social functioning;
3. Marked difficulties in maintaining concentration, persistence, or pace;
4. Repeated episodes of decompensation; each of extended duration.

20 C.F.R. § 404, Subpt. P, App. 1, 12.04.

The ALJ found that the plaintiff did meet number 3, but he concluded that she failed to satisfy any of the other criteria. (These are commonly known as the "B" criteria. *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002)). The plaintiff believes the evidence leans the other way. Citing to the questionnaire filled out by Dr. Cothron, the plaintiff argues that her treating physician's reports support a finding of adequate severity as to each of the four criteria listed above (although she needs only one more to qualify). Specifically, Dr. Cothron had opined that plaintiff was markedly limited as to her ability to "maintain attention and concentration for extended periods," "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance," and "work in coordination with or proximity to others without being distracted by them." (Tr. 226.) Dr. Cothron also believed the plaintiff was markedly limited in her ability to interact with the public, ask questions, accept instructions and respond to criticism from supervisors, get along with peers, set goals, make plans, and respond to changes in the work setting. (Tr. 228.) She also stated that plaintiff experienced episodes of deterioration or decompensation and that Kennedy's anxiety decreased her ability to function.

The plaintiff argues that Cothron's opinions support each of the four factors listed above and that the ALJ's failure to give controlling weight to her opinions explicitly was error. As to the first

4

factor, a marked restriction in daily living activities, the ALJ found that plaintiff had only mild restrictions in her daily living. (Tr. 21.) In doing so, he gave substantial weight to Dr. Hauer's testimony that Kennedy's daily activity impairment was mild. (Tr. 340.) The ALJ also noted Dr. Elmergreen's observations that plaintiff maintained a household and cooked, cleaned, washed dishes, drove a car, etc. She also homeschooled her two sons and cared for her goats, chickens, horses and other animals.

The ALJ recognized Cothron's opinions elsewhere but did not address them specifically with regard to the first factor. Indeed, it is doubtful that Cothron's opinions are even relevant to the first factor. To the extent her opinions could be construed very broadly to include Kennedy's daily activities, there is no basis for concluding that they contradict Dr. Hauer's opinion that Kennedy's daily activity restrictions were mild. Instead, it is clear that the opinions expressed on the check-the-box form Cothron filled out are opinions about Kennedy's ability to work in a traditional work environment. That is, they say nothing about Kennedy's ability to maintain a household or function in everyday life. Accordingly, I do not find that it was error for the ALJ to have failed to address Cothron's opinions on the first factor and I also find his conclusion supported by substantial evidence.

As to the second factor, the ALJ found the plaintiff moderately (rather than markedly) limited in social functioning, again giving substantial weight to Dr. Hauer's opinion. (Tr. 21.) Hauer testified that Kennedy was able to maintain good social skills, was well mannered and had logical and coherent speech and conversation. She was moderately limited, however, due to mood volatility and anxiety. (Tr. 340-41.) The ALJ also noted the report of Dr. Elmergreen, who found Kennedy spoke clearly, and was talkative and cooperative. (Tr. 130.) Elmergreen concluded that

5

"Intellectually, she appears to be in the average to above-average range with good social skills." (Tr. 131.) The ALJ did note Dr. Cothron's opinions that Kennedy was markedly limited in interacting with the general public and interacting (in some cases) with co-workers; but he also observed that Dr. Cothron believed Kennedy was only moderately limited in maintaining socially appropriate behavior. (Tr. 22.) Thus, Dr. Cothron's opinions on Kennedy's social functioning cut both ways–in some respects she was markedly limited and in others she was only moderately limited. The ALJ gave more weight to Dr. Hauer's opinion, which was not as equivocal, and to the report of Elmergreen. The ALJ discussed all of the relevant evidence in some detail, and his reasons for reaching his conclusion are evident from his opinion. It was thus not error to conclude that Kennedy was moderately–not markedly–limited in her social functioning.

The ALJ concluded that Kennedy *was* markedly limited with regard to the third factor, again relying on the conclusion of Dr. Hauer. The parties do not contest this conclusion.

The fourth factor requires repeated episodes of decompensation, each of extended duration. The ALJ found that the plaintiff had experienced "one or two" extended episodes, which do not constitute "repeated" episodes. 20 C.F.R. Part 404, Subpt. P, App. 2, § 12.00 ("repeated" means three or more within one year). Dr. Hauer testified that the plaintiff's case was "characterized by several episodes of exacerbated depression, none of which have been of a real extensive nature. . . . [o]nly a couple of which have been of intense nature." (Tr. 341.) Thus, he concluded Kennedy should be classified at the "one or two level." (Tr. 341.) The plaintiff does not explain why the ALJ erred in concluding that she had not suffered repeated (three or more) episodes. Dr. Hauer's testimony did not support such a finding, and Dr. Cothron only indicated that the plaintiff had suffered such episodes without indicating how many. (Tr. 229.) In a footnote, the plaintiff suggests

6

that the record reflects numerous changes in medication and treatment, etc., as well as increased symptomatology, which could constitute evidence of decompensation episodes. But even if such events indicated decompensation episodes, they do not speak to the extent of such episodes at all, and they certainly do not undercut the specific opinion of Dr. Hauer or any other evidence in the record. Accordingly, the ALJ's conclusion was not error. In sum, I find that the ALJ's conclusion that the plaintiff did not meet the criteria of Listing 12.04 was supported by substantial evidence.

**2. Treating Physician Rule**

Second, Kennedy claims the ALJ impermissibly "ignored" the opinions of Dr. Cothron without giving good reasons for rejecting Dr. Cothron's opinions. Generally speaking, the ALJ's opinion is replete with discussion of Dr. Cothron's opinions. As noted above, the ALJ addressed Dr. Cothron's conclusions about various marked limitations that might impact the four factors under Listing 12.04. In that respect, it cannot be said that the ALJ ignored the treating physician's opinions. Moreover, the ALJ did not squarely reject any of Dr. Cothron's opinions on those issues because her opinions did not specifically address the listing factors. For example, Dr. Cothron did not opine that Kennedy was "markedly limited in daily living"–the language of one of the 12.04 factors–but instead found that she was limited, *inter alia,* in taking direction from supervisors, interacting with co-workers, and the like. Nor did Dr. Cothron have an opinion that Kennedy had experienced repeated episodes of extended decompensation. Thus, because the ALJ addressed Dr. Cothron's opinions and because Dr. Cothron did not specifically opine on any of the 12.04 factors, the ALJ did not "ignore" Dr. Cothron's opinions, at least as pertinent to Listing 12.04.

In the section of her brief addressing the vocational expert, however, the plaintiff does cite specific–and dispositive–instances in which the ALJ appears to have simply ignored the treating

7

physician's opinion. In particular, Dr. Cothron had opined that the plaintiff's limitations would force her to miss three or more days of work per month. (Tr. 230.) The ALJ asked the vocational expert ("VE") about this limitation, and the VE stated that "absenteeism more than twice a month would preclude a person from working on a regular basis." (Tr. 346.) Thus, if the ALJ had accepted Dr. Cothron's opinion on this score, it would have been dispositive in light of the VE's testimony. Yet nowhere does the ALJ's opinion address this issue. As such, it is impossible to tell why the treating source's opinion on this issue was rejected.

An ALJ is not, of course, bound by a physician's opinion even if the opinion comes from a treating source. But an ALJ must reconcile a physician's opinion with the evidence as a whole, especially if the opinion comes from a treating source. In *Haynes v. Barnhart,* for example, the claimant made a similar argument: "Haynes next argues that the ALJ improperly disregarded Dr. Mulhausen's testimony that Haynes would be required to miss up to three workdays per month due to his pulmonary condition and heel pain. This testimony is important to Haynes, because the vocational expert testified that if a claimant must miss more than two workdays a month, the claimant would be unemployable." 416 F.3d 621, 630 (7th Cir. 2005). Unlike the present case, however, the Seventh Circuit concluded that the ALJ in that case had properly discounted the physician's opinion. First, the medical opinion was given in cursory form by a non-treating physician. Second, it was belied by the fact that the plaintiff had not sought medical treatment for the conditions cited for more than two years. Finally, treatment notes indicated that the claimant's condition was actually improving during the relevant period. Thus, the court concluded that "the ALJ was entitled to reject Dr. Mulhausen's opinion in favor of other physicians' opinions and

8

evidence in the record-particularly when Dr. Mulhausen's conclusion regarding the three-workday restriction was itself unsupported by any explanation or evidence." *Id.* at 631.

In contrast, here we have no information as to why the ALJ rejected the treating psychiatrist's opinion that the plaintiff's limitations would cause more than three absences a month. Indeed, the ALJ's opinion is quite confusing on this score. The ALJ stated that he accorded controlling weight to the opinion of Dr. Hauer on plaintiff's residual functional capacity, but Dr. Hauer did not testify about the plaintiff's residual functional capacity at all. (Tr. at 338-42.) Instead, his testimony was limited to a discussion of the four factors noted above pertinent to Listing 12.04. Thus, the reason behind the ALJ's RFC conclusion is not apparent from the record. Indeed, the ALJ asked the VE a hypothetical about the claimant's potential to miss work, but never explained why he did not incorporate that possibility into the plaintiff's RFC. I conclude that because the ALJ's RFC conclusion is not supported by substantial evidence, remand is appropriate for clarification on this issue.

**3. Vocational Expert Question**

Finally, the plaintiff asserts that the ALJ's question to the vocational expert lacked substantial evidence in the record. "Ordinarily, a hypothetical question to the vocational expert must include all limitations supported by medical evidence in the record." *Young v. Barnhart,* 362 F.3d 995, 1003 (7th Cir. 2004). The ALJ's hypothetical question presumed that the plaintiff was limited to light work that was simple, routine, repetitive and low stress. Based on those limitations, the VE concluded that there were 144,000 jobs in Wisconsin that fit the bill, including cashier, janitor, food service and packaging jobs. (Tr. 345.) The plaintiff agrees that these limitations are supported by the record, but she argues that additional limitations should have been included in the

9

hypothetical question. In particular, as the ALJ himself noted, the plaintiff had marked deficiencies in concentration, persistence and pace. (Tr. 22.) She also had one or two extended episodes of deterioration. (Tr. 23.) In addition, there was ample evidence in the record supporting the plaintiff's other serious (even if not "marked") limitations in social functioning, accepting directions from supervisors, interacting with the public and co-workers, etc. Having failed to include these and other limitations in his hypothetical question, plaintiff argues, the ALJ erred.

I agree with the plaintiff that the ALJ's hypothetical questions did not sufficiently account for the serious limitations evidenced in the record. The hypothetical asked only about an individual able to do "simple, repetitive, low stress work" without accounting for any other limitations. Even in the ALJ's own interpretation of the evidence, the plaintiff suffered from bipolar disorder and social phobia. She had a marked limitation in pace, persistence and concentration and moderate limitations in numerous other respects, all of which were supported fully by Dr. Cothron and mostly by Dr. Hauer. In short, the ALJ's question, in accounting only for "simple, repetitive and low stress" work, failed to take into consideration any of the substantial mental or emotional limitations noted above. *Young v. Barnhart* is binding precedent on this issue:

> The ALJ found that Young was severely impaired by an adjustment disorder marked by blunted insight and judgment, decreased mood and functioning, and an increased tendency to become irritable. He also appears to have credited the findings of medical experts who found that Young is impulsive, apathetic, and has poor social judgment and that he is moderately limited in his ability to carry out detailed instructions, interact appropriately with the general public, set realistic goals, make plans independently of others, and respond to criticism from supervisors. After a thorough review of the record, we are unable to determine, however, whether the ALJ's assessment of Young's RFC adequately considers these personality disorders. The ALJ concluded that Young "had the residual functional capacity to perform the nonexertional requirements of simple, routine, repetitive, low stress work with limited contact with coworkers and the public. There were no exertional limitations."

10

> Although this RFC requires that Young have limited contact with the public and coworkers, it says nothing of limiting contact with supervisors, despite the fact that there was substantial evidence within the record that Young has difficulty accepting instruction, responding appropriately to criticism, and interacting with others on the job.

*Young v. Barnhart,* 362 F.3d 995, 1002 (7th Cir. 2004) (citations omitted). In fact, the RFC assessment in *Young* was more complete than the present one because it contained a limitation about contact with the public, whereas the question posed to the VE in this case had no such limitation even though there is substantial support for such a limitation in the record. It is hard to square this RFC conclusion with the ALJ's determination that the plaintiff has social phobia as well as the substantial evidence in the record about the plaintiff's anxiety, bipolar disorder, depression, ability to work with others, ability to make decisions, ask questions, respond to criticism, respond to changes in the work setting, or set goals. (Tr. 228-230.)

In addition, I note that the same problem arises here that the court found justified reversal in *Young*. There, like here, there was evidence that the claimant had marked difficulty accepting instruction and criticism as well as difficulty in making independent plans and setting goals. *Id.* at 1002. But those difficulties were not factored into the RFC analysis: "[n]or does the ALJ explain how he reconciles Young's two conflicting limitations-the fact that Young will have difficulty accepting instruction and criticism from others on the one hand and the fact that he has difficulty making plans independently and setting realistic goals on his own on the other hand." 362 F.3d at 1002. On this basis alone, therefore, it is clear that the RFC questions and the ALJ's analysis of the plaintiffs RFC do not sufficiently take into account several of the plaintiff's marked limitations.

In sum, although there was ample evidence suggesting substantial limitations on the plaintiff's inability to work, the ALJ's RFC hypotheticals accounted only for limitations based on

11

simple, routine, repetitive and low stress work. Thus, as the court concluded in *Young:* "The RFC falls short because it fails to account for the evidence in the record regarding [claimant's] problems accepting instruction, responding appropriately to criticism from supervisors, thinking independently, and setting realistic goals. Because the administrative judge used this RFC as the basis for his hypothetical question to the vocational expert, his hypothetical question also failed to include all of the necessary information." *Id.* at 1002-03. Remand is therefore appropriate.

## III. Conclusion

For the reasons give above, I find that the decision of the Commissioner is not supported by substantial evidence. Accordingly, the case is remanded for further proceedings consistent with this opinion.

**SO ORDERED** this   31st   day of July, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge